[Cite as *State v. Harris*, 2016-Ohio-3424.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

        Plaintiff-Appellee,              :                   No. 15AP-683
                                                                        (C.P.C. No. 13CR-6289)
v.                                               :
                                                                     (REGULAR CALENDAR)
Mario M. Harris,                                 :

        Defendant-Appellant.            :

D E C I S I O N

Rendered on June 14, 2016

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee.

**On brief:** *Clark Law Office* and *Toki Michelle Clark*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Mario M. Harris, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty of one count of aggravated robbery, one count of aggravated murder, and one count of having a weapon while under disability, all with firearm specifications. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} By indictment filed November 26, 2013, plaintiff-appellee, State of Ohio, charged Harris with one count of aggravated robbery in violation of R.C. 2911.01, a felony of the first degree; one count of aggravated murder in violation of R.C. 2903.01, an unclassified felony; and one count of having a weapon while under disability in violation of R.C. 2923.13, a felony of the third degree. The aggravated robbery and aggravated

murder charges both contained repeat violent offender specifications and gang specifications. Additionally, all charges contained accompanying firearm specifications. The charges related to the robbery and shooting death of Henry Monger, III. Harris entered a plea of not guilty to all charges. Harris waived his right to jury trial for the having a weapon under disability charge.

{¶ 3} A jury trial on the aggravated robbery and aggravated murder charges commenced on November 18, 2014. Kyle Shipley, a firefighter paramedic with the Truro Township Fire Department in Reynoldsburg, testified that around 3:00 a.m. on November 7, 2013, he responded to a dispatch at the East Side Lounge, a night club located at 6115 E. Livingston Avenue. Upon arrival, Shipley found Monger lying on his side on the floor near the bar. Monger was unconscious and had no pulse, and Shipley testified he observed two gunshot wounds on Monger's chest and a third on Monger's upper thigh. Paramedics transported Monger to Grant Medical Center, where he later died.

{¶ 4} Tobias Collins, who worked as a club promoter at the East Side Lounge, testified that on the night of November 6, 2013 he was working with Monger to promote an event featuring an adult entertainer. The event attracted a large crowd, and Collins testified the night club had armed security guards present and officers from the Columbus Division of Police's gang unit were on the scene, which Collins characterized as typical for a large event at that particular club. Collins testified that Monger was responsible for collecting money from the dancers to turn in to his supervisors.

{¶ 5} Collins said the event was wrapping up and the crowd was dispersing around 2:50 a.m. on November 7, 2013, so the officers from the gang unit left the East Side Lounge, and Collins and Monger remained to close the club. A short time later, Collins exited the club with Monger and walked toward Monger's car. Collins testified that as Monger approached his driver's side door, a man emerged from behind the vehicle dressed in all black. Collins said the man had a tattoo on the left side of his face. Collins said the man approached Monger, said "give me everything you got," and then started shooting. (Tr. Vol. II at 132.) Collins testified he heard three or four gunshots. After the gunshots, Collins said he and Monger ran back inside the club. When Monger got inside, he said "I am hit" before falling on the floor. (Tr. Vol. II at 137.) Collins testified he saw

the shooter run away from the night club toward a white Chevy Impala, which was the only car in the vicinity.

{¶ 6}  About one week after the shooting, police asked Collins to look at a photo array of possible suspects, and Collins identified Harris as the man he saw shoot Monger. Collins agreed that he testified at a prior hearing that he was 65 percent sure the person in the photo he identified was the shooter.  At trial, however, Collins said he was 85 or 90 percent sure Harris was the shooter.  Over Harris' objection, the trial court allowed the state to introduce an audio recording of Collins' photo array interview.  On the audio recording, Collins said he identified Harris' photo because he "remember[s] that face" and he "remember[s] it clearly."  (Tr. Vol. II at 222.)

{¶ 7}  Nadine McClasky, a photographer hired to cover the event at the East Side Lounge on the November 6 and 7, 2013, testified that she waited until after closing time to leave the event that night.  McClasky testified she exited the club at the same time as Monger and Collins and within ten seconds she heard three gun shots.  McClasky said the shooter took off running, and she saw that he was wearing black sweat pants, a black hooded sweatshirt with the hood up, and a black knit cap.  She thought the shooter had scratches or something "uneven" on his face, saying "it didn't seem like his face was of no disruptions."  (Tr. Vol. II at 276.)  McClasky described the shooter as "a black male of average height and weight, which would be about five eight to five ten-ish, and roughly 165 to 185-ish."  (Tr. Vol. II at 286.)  She also estimated he was younger than 30 years old. When police eventually obtained a warrant for Harris' arrest, the warrant described Harris as a "[m]ale black" with the height and weight "[f]ive nine, 150," and a date of birth of November 14, 1991.  (Tr. Vol. III at 406-07.)

{¶ 8}  After the shooting, McClasky ran back into the East Side Lounge with Monger.  McClasky said she, along with two other people, performed CPR on Monger, and McClasky called 911.  Defense counsel objected to the playing of portions of the 911 call it deemed hearsay, but the trial court overruled the objection and allowed the state to play the entire recording of the call.  On the audio recording, McClasky tells the operator someone had been shot, the shooter was wearing a black hoodie, and he left in a four-door white Chevy Impala.

{¶ 9} Police later asked McClasky to look at a photo array, and she identified Harris as the person she saw wearing the black hooded sweatshirt and fleeing from the parking lot during the early morning hours of November 7, 2013. McClasky testified she expressed some hesitation about her selection, and she told officers she was 75 percent certain she had identified the right person. McClasky said when she saw a picture of Harris in the photo array, she realized that what she had initially thought were scratches on his face was actually a tattoo.

{¶ 10} Detective David Dennison of the Columbus Division of Police testified that in the course of his investigation of Monger's death, he directed other officers to collect evidence, process the scene, and take photographs. Detective Dennison obtained surveillance footage of the parking lot of the East Side Lounge, and the footage showed a man shoot Monger. During the course of the investigation, Detective Dennison said he received anonymous telephone tips in which the callers gave police Harris' name as the shooter. The anonymous tips led police to create a photo array containing Harris' picture. Detective Dennison testified he also used eyewitness descriptions of a white Chevy Impala leaving the scene to aid his investigation. Police received another anonymous phone tip that Harris' girlfriend, Shamiqua Gordon, owned a white Chevy Impala.

{¶ 11} Detective Robert Vass of the Columbus Division of Police testified he works in the police department's gang unit. Detective Vass was patrolling the East Side Lounge during the early morning hours of November 7, 2013. He testified he saw Harris there during the promoted event, initially in the parking lot and then inside the club. Detective Vass testified Harris is a documented member of a gang known as the Deuce Deuce Bloods, also commonly known as the 22nd Street Bloods.

{¶ 12} Additionally, the state certified Detective Vass as an expert in gang and gang identification. The state played recordings of phone calls Harris made from jail while he was awaiting trial. Over defense counsel's objection, the state asked Detective Vass whether he could determine what the conversations generally were about. The state would play a portion of the phone call, and then Detective Vass would offer a summary of the conversation. In one of the phone calls, Harris tells the other person on the phone to tell "Meagan [to] come say she is a hundred percent sure that I did not have on all black and I left when she left." (Tr. Vol. III at 513.) Harris further instructs the other caller to

"[t]ell her to tell Brittany that I had on a red and black Chicago Bulls coat, and tell her to tell Meagan the same thing in case she forgot," and to "[t]ell Brittany to tell Meagan" that he "got * * * over her house around 2:45." (Tr. Vol. III at 513-14.) Detective Vass testified this call was about Harris wanting the other caller "to relay information to Brittany and Meagan about what he was wearing that night and * * * what time he was dropped off." (Tr. Vol. III at 514.)

{¶ 13} Meagan Sparks, a friend of Harris, testified she was at the East Side Lounge on November 6 and 7, 2013, and she saw Harris there wearing a Chicago Bulls jacket, a red and black scarf, and a red and black hat.

{¶ 14} At the conclusion of the trial, the jury returned guilty verdicts on the charges of aggravated robbery and aggravated murder, along with the accompanying specifications. The trial court, pursuant to bench trial, found Harris guilty of having a weapon while under disability with accompanying specification.

{¶ 15} On January 8, 2015, Harris filed a motion for new trial on the basis of newly discovered evidence. Harris argued he had evidence showing the identity of "the true assailant." (Jan. 8, 2015 Def.'s Mot. for New Trial.) The state filed a memorandum contra on February 5, 2015 opposing Harris' motion for new trial. Following an evidentiary hearing, the trial court denied Harris' motion for new trial in a June 4, 2015 decision and entry. The trial court then conducted a sentencing hearing on June 18, 2015 and sentenced Harris to an aggregate prison term of life without the possibility of parole. The trial court journalized Harris' convictions and sentence in a June 19, 2015 judgment entry. Harris timely appeals.

## II. Assignments of Error

{¶ 16} Harris assigns the following errors for our review:

> [1.] The verdict of guilty is not supported by legally sufficient evidence and is against the manifest weight of evidence.
>
> [2.] The trial court erred by imposing consecutive sentences pursuant to R.C. 2929.14. Also, the trial court issued a void and abusive sentence.
>
> [3.] Trial counsel rendered ineffective assistance of counsel in violation of the 6th Amendment to the U.S. Constitution and Article I, Sections 10 & 16 of the Ohio Constitution.

[4.] A trial court errs when it allows the government to play an audio/video recording of a photo array.

[5.] A trial court commits error when it allows a testifying police officer to interpret an audio tape.

[6.] The gang specification in the criminal indictment and sentencing is a first amendment constitutional right of assembly violation.

[7.] The trial court erred in denying defendant-appellant's right for a new trial based on the discovery of new evidence.

## III. First Assignment of Error – Sufficiency and Manifest Weight of the Evidence

{¶ 17} In his first assignment of error, Harris argues his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

### A. Sufficiency of the Evidence

{¶ 18} Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* The relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. *State v. Mahone*, 10th Dist. No. 12AP-545, 2014-Ohio-1251, ¶ 38, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.

### 1. Aggravated Robbery and Aggravated Murder

{¶ 19} Harris was convicted of aggravated robbery in violation of R.C. 2911.01, which provides that "[n]o person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it; [h]ave a dangerous ordnance on or about the offender's person or under the offender's control; [or] [i]nflict, or attempt to inflict, serious physical harm on another." R.C. 2911.01(A)(1) through (3). A "theft offense," pursuant to R.C. 2913.01(K), includes violations of R.C. 2911.02, robbery, and R.C. 2913.02, theft. Theft requires the state to prove beyond a reasonable doubt that

Harris, with the purpose to deprive the owner of property, knowingly obtained control over the property without the consent of the owner or through deception, threat, or intimidation. R.C. 2913.02. A person acts with a particular purpose when "it is [his] specific intention to cause a certain result." R.C. 2901.22(A). A "deadly weapon," as defined in R.C. 2923.11, is "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."

{¶ 20} Harris was also convicted of aggravated murder. Pursuant to R.C. 2903.01(B), "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * aggravated robbery."

{¶ 21} The state presented testimony at trial from witnesses identifying Harris as the person who shot Monger while committing or attempting to commit an aggravated robbery against him. The witnesses described Harris as saying "give me everything you got" prior to opening fire. Both Collins and McClasky identified Harris from a photo array as the man they saw approach Monger in the parking lot, demand money from him, and then shoot him. There was no dispute that Monger died as a result of the gunshot wounds he sustained in the parking lot of the East Side Lounge. Collins and McClasky both testified to hearing several gunshots. The jury could conclude that, based on the witnesses' testimony and from the surveillance footage of the incident, Harris acted purposely in causing Monger's death. A jury may consider the entire set of circumstances surrounding the shooting and infer the defendant's intent based on those facts. *State v. Loughman*, 10th Dist. No. 10AP-636, 2011-Ohio-1893, ¶ 47, citing *State v. Grant*, 67 Ohio St.3d 465, 478 (1993.) Therefore, there was sufficient evidence to support Harris' convictions for aggravated robbery and aggravated murder.

### 2. Having a Weapon While Under Disability

{¶ 22} Additionally, Harris was convicted of having a weapon while under disability. R.C. 2923.13(A)(2) provides, in relevant part, that "[u]nless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordinance, if * * * [t]he person is under indictment for or has been convicted of any felony offense of violence."

{¶ 23} Harris does not develop an argument with respect to the sufficiency of the evidence presented to convict him of having a weapon while under disability. The record, however, indicates the state presented sufficient evidence that Harris was under a disability by virtue of his prior criminal record, and that he knowingly acquired, had, carried, or used a firearm.

### 3. Specifications

{¶ 24} Harris' convictions for aggravated robbery and aggravated murder also contained accompanying repeat violent offender specifications, gang specifications, and firearm specifications. Further, his having a weapon while under disability conviction contained a firearm specification. Again, Harris does not develop any argument with respect to the sufficiency of the evidence presented to find the specifications.

{¶ 25} Pursuant to R.C. 2941.149(A), a court may not determine an offender to be a repeat violent offender absent a specification in the indictment to that effect. R.C. 2941.149(B) states "the court shall determine the issue of whether an offender is a repeat violent offender." Additionally, R.C. 2929.01(CC) defines "repeat violent offender" as a person who (1) is being sentenced for committing or complicity in committing aggravated murder, murder, a felony of the first or second degree that is an offense of violence, an attempt to commit any of these offenses if the attempt is a felony of the first or second degree or a substantially equivalent offense, and (2) was previously convicted of or pleaded guilty to one of the aforementioned offenses.

{¶ 26} "[T]his court has stated that '[i]f an indictment contains a repeat violent offender specification, it is the court that shall determine the issue of whether the offender is a [repeat violent offender].' " (Emphasis omitted.) *State v. Samuel*, 10th Dist. No. 11AP-158, 2011-Ohio-6821, ¶ 42, quoting *State v. Brown*, 10th Dist. No. 10AP-836, 2011-Ohio-3159, ¶ 16, citing R.C. 2941.149(B). The state presented evidence of Harris' previous conviction of robbery in violation of R.C. 2911.02, as well as evidence that he was previously adjudicated delinquent in juvenile court for the offenses of felonious assault and aggravated robbery. *See, e.g., Samuel* at ¶ 44 (noting the definition of repeat violent offender in R.C. 2929.01(CC)(2) does not require that the offender be a certain age at the time of the prior offense). Thus, there was sufficient evidence for the trial court to find the repeat violent offender specification.

{¶ 27} The gang specification under R.C. 2941.142 requires the imposition of a mandatory prison term if an offender commits a felony "that is an offense of violence while participating in a criminal gang." Detective Vass testified at length regarding Harris' membership in the 22nd Street Bloods, and Harris' counsel conceded Harris was in a gang during his closing argument. There is no dispute that both aggravated robbery and aggravated murder are felony offenses of violence. Thus, there was sufficient evidence to impose the gang specification.

{¶ 28} Finally, the firearm specification in R.C. 2941.145(A) requires imposition of a mandatory prison term if the offender "had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." The surveillance footage showed the assailant shoot Monger, and the eyewitnesses identified Harris as the man who attempted to rob Monger, shot Monger, and fled the scene. Thus, there was sufficient evidence for the trial court to impose the firearm specification on all three charges.

{¶ 29} As the state notes, Harris does not challenge the sufficiency of the evidence with respect to any specific element of any of the charged offenses or specifications. Instead, Harris argues, without citation to authority, that the fact that detectives focused their investigation on Harris only after receiving an anonymous tip renders the evidence uncovered in the ensuing investigation insufficient to convict him of these crimes. We agree with the state that Harris' argument is properly construed as a challenge to the weight of the evidence, and we will analyze it accordingly.

## B. Manifest Weight of the Evidence

{¶ 30} When presented with a manifest weight argument, an appellate court engages in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict. *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *Thompkins* at 387. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a ' "thirteenth juror" ' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Determinations of credibility and weight of the testimony are

primarily for the trier of fact.  *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.  Thus, the jury may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony."  *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 31} An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387.  Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 32} As we noted above, Harris' manifest weight argument centers on the anonymous tips that detectives initially relied on to build their case against Harris.  Harris argues these tips somehow tainted the rest of the procedures used to gather evidence against him.  However, Harris does not identify any authority indicating that an anonymous tip somehow renders subsequently gathered evidence invalid.  Detective Dennison testified that police received anonymous tips regarding Harris' involvement, and the jury was free to weigh that evidence in assessing the overall strength of the evidence presented by the state.

{¶ 33} Harris next argues the evidence identifying him as the perpetrator was against the manifest weight of the evidence.  Specifically, Harris notes the lack of physical evidence connecting him to the crime, and he argues the witnesses who identified him in a photo array lacked credibility.

{¶ 34} "[A] lack of physical evidence, standing alone, does not render [a defendant's] conviction against the manifest weight of the evidence."  *State v. Peeples*, 10th Dist. No. 13AP-1026, 2014-Ohio-4064, ¶ 21, citing *State v. Conner*, 10th Dist. No. 12AP-698, 2013-Ohio-2773, ¶ 12, citing *State v. Shedwick*, 10th Dist. No. 11AP-709, 2012-Ohio-2270, ¶ 32.  " 'If [witness] testimony is believed then the lack of fingerprints, DNA,

footprints or any other physical evidence does not render the conviction against the manifest weight of the evidence.' " *Peeples* at ¶ 21, quoting *State v. Jackson*, 7th Dist. No. 09 JE 13, 2009-Ohio-6407, ¶ 16 (concluding a conviction based on victim's testimony identifying the defendant was not against the manifest weight of the evidence despite the lack of physical evidence).

{¶ 35} Harris argues the witness identifications of his picture in the photo array lacked credibility, thus rendering his convictions against the manifest weight of the evidence. Though Collins testified at trial he was 85 or 90 percent certain Harris was the shooter, Collins also agreed he had testified in a previous proceeding that he was only 65 percent certain Harris was the shooter. Though Harris describes this as a reversal rendering Collins' testimony lacking in credibility, Collins offered an explanation for his change, stating he has not been able to get the shooter's face out of his mind. Additionally, the state introduced the audio recording of Collins' initial photo array interview in which he selected Harris' photograph and stated he remembered Harris' face clearly. As we noted above, the jury may take note of inconsistencies in a witness' testimony and resolve them accordingly. *Raver* at ¶ 21. Additionally, McClasky separately identified Harris in a photo array and gave police a physical description of the shooter that matched Harris' height, weight, and age. Detective Vass also testified he was at the East Side Lounge the evening of the shooting and that he saw Harris there.

{¶ 36} In addition to the eyewitness testimony identifying Harris, there was also evidence that the shooter fled the scene in a white Chevy Impala. Police learned through their investigation that Harris' girlfriend drove a white Chevy Impala. This is circumstantial evidence corroborating the identification of Harris as the shooter. *See State v. Diggs*, 10th Dist. No. 14AP-18, 2014-Ohio-3340, ¶ 20 (noting circumstantial evidence can have the same probative value as direct evidence).

{¶ 37} Though Harris argues the jury should have placed more weight on Sparks' testimony that Harris was wearing a red and black Chicago Bulls jacket on the night of the shooting, the jury also heard the jailhouse phone calls in which Harris repeatedly reminds the other caller that Sparks needed to testify that he was wearing red and black, thereby undermining the strength of Sparks' testimony. Additionally, by Sparks' own admission, she last saw Harris around 2:30 a.m. and the shooting did not occur until 3:00 a.m.,

giving Harris ample time to remove or conceal a jacket if he was indeed wearing one. Given the conflicting testimony, we cannot say the jury lost its way in giving more credibility and weight to the physical descriptions and photo array identifications of Collins and McClasky than it gave to Sparks' testimony.

{¶ 38} Considering all of this evidence together, we cannot say the jury clearly lost its way in concluding Harris was the individual who attempted to rob, and then shot and killed, Monger. After an independent review of the record, we find sufficient evidence to support Harris' convictions, and Harris' convictions are not against the manifest weight of the evidence. We overrule Harris' first assignment of error.

## IV. Second Assignment of Error – Sentencing

{¶ 39} In his second assignment of error, Harris argues the trial court erred in imposing consecutive sentences. Additionally, Harris asserts his sentence was void and abusive. We address each of these issues separately.

{¶ 40} An appellate court will not reverse a trial court's sentencing decision unless the evidence is clear and convincing that either the record does not support the sentence or that the sentence is contrary to law. *State v. Chandler*, 10th Dist. No. 04AP-895, 2005-Ohio-1961, ¶ 10, citing *State v. Maxwell*, 10th Dist. No. 02AP-1271, 2004-Ohio-5660, ¶ 27, citing *State v. Comer*, 99 Ohio St.3d 463, 2003-Ohio-4165, ¶ 10. *See also State v. Marcum*, ___ Ohio St.3d ___, 2016-Ohio-1002, ¶ 1 ("an appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law"). " 'In determining whether a sentence is contrary to law, an appellate court reviews the record to determine whether the trial court considered the appropriate factors, made the required findings, gave the necessary reasons for its findings, and properly applied the statutory guidelines.' " *Chandler* at ¶ 10, quoting *Maxwell* at ¶ 27, citing *State v. Altalla*, 10th Dist. No. 03AP-1127, 2004-Ohio-4226, ¶ 7.

### A. Merger for Purposes of Sentencing

{¶ 41} Harris first argues the trial court erred when it imposed consecutive sentences for his aggravated murder and aggravated robbery convictions. Harris argues those offenses should have merged for purposes of sentencing. "When the defendant's

conduct constitutes a single offense, the defendant may be convicted and punished only for that offense. When the conduct supports more than one offense, however, a court must conduct an analysis of allied offenses of similar import to determine whether the offenses merge or whether the defendant may be convicted of separate offenses." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 24.

{¶ 42} To determine whether two offenses are allied offenses that merge into a single conviction, a court must evaluate three separate factors: the conduct, the animus, and the import. *Id.* at paragraph one of the syllabus. "If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance – in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, and (3) the offenses were committed with separate animus or motivation." *Id.* at ¶ 25. Ultimately, when the defendant's conduct constitutes offenses involving separate victims or if the harm resulting from each offense is separate and identifiable, the offenses are of dissimilar import and do not merge. *Id.*

{¶ 43} Here, Harris argues the offenses of aggravated robbery and aggravated murder were so linked as to constitute allied offenses of similar import. However, the Supreme Court of Ohio has concluded "aggravated murder, as defined in R.C. 2903.01, is not an allied offense of similar import to aggravated robbery, as defined in R.C. 2911.01." *State v. Bickerstaff*, 10 Ohio St.3d 62, 66 (1984). Though *Bickerstaff* predates *Ruff*, the same conclusion is true under the test set forth in *Ruff*. The harm resulting from aggravated robbery is separate and identifiable from the harm resulting from aggravated murder. *See, e.g.*, *State v. Lee*, 10th Dist. No. 14AP-1009, 2016-Ohio-122, ¶ 18 (finding no error in failing to merge convictions of aggravated robbery and felony murder because "the act of shooting [the victim] in his abdomen was far in excess of the force required to commit the aggravated robbery" and "[s]hooting [the victim] was unnecessary to the commission of the aggravated robbery"). Thus, we find no error in the trial court failing to merge Harris' aggravated robbery conviction with his aggravated murder conviction for purposes of sentencing.

### B. Void and Abusive Sentence

{¶ 44} Harris next argues the trial court erred in imposing a sentence that is void and abusive. More specifically, Harris asserts the trial court erred in ordering the sentences for the gang specifications, repeat violent offender specifications, and firearm specifications to run consecutively rather than concurrently.

{¶ 45} The trial court sentenced Harris to 11 years on the aggravated robbery count consecutive to 3 years on the firearm specification and consecutive to 10 years on the repeat violent offender specification. On the aggravated murder count, the trial court sentenced Harris to life imprisonment without the possibility of parole consecutive to 3 years on the firearm specification. With respect to the having a weapon while under disability count, the trial court sentenced Harris to three years imprisonment consecutive to an additional 3-year sentence on the firearm specification. Further, the trial court directed the gang specifications attached to the aggravated murder and aggravated robbery counts shall be served concurrently with each other, consecutive to the aggravated murder and aggravated robbery counts, and consecutively to all specifications as to the aggravated robbery and aggravated murder counts. Harris argues the trial court erred in ordering the specifications to run consecutively rather than concurrently.

{¶ 46} R.C. 2941.149 contains the repeat violent offender specification. Pursuant to R.C. 2929.14(B)(2)(a)(i), when imposing the maximum possible prison term for an underlying felony offense of violence, a trial court has discretion to impose an additional prison term of one to ten years for the repeat violent offender specification contained in R.C. 2941.149. Although imposition of the additional prison term is discretionary, if the trial court chooses to impose the additional term under R.C. 2929.14(B)(2)(a), the sentencing statute requires the additional term to be served "consecutively to and prior to the prison term imposed for the underlying offense." R.C. 2929.14(B)(2)(d). *See also State v. Whitaker*, 12th Dist. No. CA2012-10-013, 2013-Ohio-4434, ¶ 17.

{¶ 47} Here, the trial court sentenced Harris to 11 years on the aggravated robbery charge, the maximum possible prison term. The trial court exercised its discretion in imposing the additional prison term on the repeat violent offender specification, and Harris does not articulate how the trial court abused its discretion in this regard. Thus, imposition of an additional prison term for the repeat violent offender specification to run

consecutive to the sentence on the aggravated robbery conviction was in accordance with law.

{¶ 48} R.C. 2941.145 sets forth the firearm specification attached to Harris' convictions.  Pursuant to R.C. 2929.14(B)(1):

> (a) Except as provided in division (B)(1)(e) of this section, if an offender who is convicted of or pleads guilty to a felony also is convicted of or pleads guilty to a specification of the type described in  [R.C. 2941.141, 2941.144, or 2941.145], the court shall impose on the offender one of the following prison terms:
>
> * * *
>
> (ii) A prison term of three years if the specification is of the type described in [R.C. 2941.145] that charges the offender with having a firearm on or about the offender's person or under the offender's control while committing the offense and displaying the firearm, brandishing the firearm, indicating that the offender possessed the firearm, or using it to facilitate the offense;
>
> * * *
>
> (g) If an offender is convicted of or pleads guilty to two or more felonies , if one or more of those felonies are aggravated murder * * * [or] aggravated robbery, * * * and if the offender is convicted of or pleads guilty to a specification of the type described in [R.C. 2929.14(B)(1)(a)] in connection with two or more of the felonies, the sentencing court *shall impose on the offender the prison term specified under [R.C. 2929.14(B)(1)(a)] for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty* and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

 (Emphasis added.)

{¶ 49} Here, Harris was convicted of three felonies, two of which were aggravated murder and aggravated robbery, and the firearm specifications were of the type listed in R.C. 2929.14(B)(1)(a).  Thus, R.C. 2929.14(B)(1)(g) required the trial court to impose a prison term for each of the "two most serious specifications" of which Harris was

convicted. *State v. Price*, 10th Dist. No. 13AP-1085, 2014-Ohio-4065, ¶ 11. By statute, the trial court was required to impose at least two three-year prison terms for the firearm specifications attendant to Harris' crimes. *Id.*, citing *State v. Dennison*, 10th Dist. No. 12AP-718, 2013-Ohio-5535, ¶ 88-89. Additionally, pursuant to R.C. 2929.14(C)(1)(a), when a trial court imposes a mandatory prison term based on a firearm specification, the offender must serve the mandatory prison term consecutive to any other mandatory prison term for a firearm specification and "consecutively to and prior to any prison term imposed for the underlying felony." *See also State v. Anderson*, 2d Dist. No. 26525, 2016-Ohio-135, ¶ 36 (noting that "[b]y law, the three-year term for the firearm specification was mandatory and was required to be served consecutively").

{¶ 50} R.C. 2929.14(B)(1)(g) conferred on the trial court the discretion to impose an additional prison term for the remaining firearm specification, which the trial court chose to do. Additionally, R.C. 2941.142 sets forth the gang specification attached to Harris' convictions of aggravated murder and aggravated robbery. Pursuant to R.C. 2929.14(G), "[i]f an offender who is convicted of or pleads guilty to a felony that is an offense of violence also is convicted of or pleads guilty to a specification of the type described in [R.C. 2941.142] the court shall impose upon the offender an *additional* prison term of one, two, or three years." (Emphasis added.) Both the aggravated murder and aggravated robbery convictions are felony offenses of violence, so R.C. 2929.14(G) required an additional term of imprisonment for the gang specification on each count. Because the sentencing statute required the trial court to impose consecutive sentences on the repeat violent offender specification and two of the firearm specifications, the only remaining issue is whether the trial court's imposition of consecutive sentences on the third firearm specification and the gang specification was in accordance with law.

{¶ 51} Before imposing consecutive sentences, a court must make certain findings. R.C. 2929.14(C) provides as follows:

> (4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the

offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 52} Thus, pursuant to R.C. 2929.14(C)(4), in order to impose consecutive terms of imprisonment, a trial court is required to make at least three distinct findings: (1) that consecutive sentences are necessary to protect the public from future crime or to punish the offender, (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) that one of the subsections (a), (b), or (c) applies. *State v. Price*, 10th Dist. No. 13AP-1088, 2014-Ohio-4696, ¶ 31, citing *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177.

{¶ 53} A trial court seeking to impose consecutive sentences must make the findings required by R.C. 2929.14(C)(4) at the sentencing hearing and also incorporate such findings into its sentencing entry. *Bonnell* at ¶ 37. However, the trial court need not state reasons to support its findings, nor is the court "required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry." *Id.* "[A] word-for-word recitation of the language of the statute is not required," but where "the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Id.* at ¶ 29.

{¶ 54} At the June 18, 2015 sentencing hearing, the trial court reviewed and discussed Harris' extensive criminal history, dating back to when he was ten years old. The court noted Harris' pattern of attempting to rob someone and then shooting them. The court noted Harris committed the offense while under post-release control from a previous offense and had only been out of prison four months before committing these crimes. After reviewing the presentence investigation report and noting the way Harris approached the proceedings and his lack remorse, the court stated "there is nothing * * * that suggests to [the court] that if the court were to provide you with any level of opportunity, that you would learn a lesson and come out a completely different and rehabilitated and changed person." (Tr. Vol. IX at 1005-06.) The trial court then stated, "[p]ursuant to [R.C. 2929.14(C)(4)] based on the seriousness of the conduct, the continuing course of conduct, the court will impose consecutive sentences as outlined on the record." (Tr. Vol. IX at 1013-14.)

{¶ 55} In this appeal, Harris does not allege the trial court did not make the findings required by R.C. 2929.14(C)(4). Having reviewed the record of the sentencing hearing, we conclude the trial court adequately articulated the necessary statutory findings in order to impose consecutive sentences. The record supports findings that consecutive sentences are necessary to punish Harris and prevent future crime, that consecutive sentences are not disproportionate to the seriousness of the offenses and to the danger Harris poses to the public, and that at least one of the statutory subsections applies.

{¶ 56} Although we conclude the trial court made the necessary findings at the sentencing hearing to impose consecutive sentences, we note the trial court did not include its findings under R.C. 2929.14(C)(4) in the judgment entry as required under *Bonnell*. Not journalizing the required R.C. 2929.14(C)(4) findings in the judgment entry does not render consecutive sentences contrary to law when the trial court makes those findings during the sentencing hearing. *Bonnell* at ¶ 30. However, because the trial court did not journalize its findings in its judgment entry, we must remand this matter to the trial court to journalize its findings under R.C. 2929.14(C)(4) in a nunc pro tunc judgment entry correcting the clerical error of omission. *Id.*; *State v. Rivera*, 10th Dist. No. 14AP-460, 2015-Ohio-1731, ¶ 6; *State v. Hillman*, 10th Dist. No. 14AP-252, 2014-Ohio-5760,

¶ 71. Such an administrative correction does not necessitate a new sentencing hearing. *Rivera* at ¶ 6.

{¶ 57} Accordingly, the trial court's sentence with regard to the specifications was in accordance with law. We overrule Harris' second assignment of error, but we remand this matter for the trial court to file a nunc pro tunc entry to correct the clerical mistake relating to its R.C. 2929.14(C)(4) findings.

## V. Third Assignment of Error – Ineffective Assistance of Counsel

{¶ 58} In his third assignment of error, Harris argues he received ineffective assistance of counsel.

{¶ 59} In order to prevail on a claim of ineffective assistance of counsel, Harris must satisfy a two-prong test. First, he must demonstrate that his counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This first prong requires Harris to show that his counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* If Harris can so demonstrate, he must then establish that he was prejudiced by the deficient performance. *Id.* To show prejudice, Harris must establish there is a reasonable probability that, but for his counsel's errors, the result of the trial would have been different. A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial. *Id.* at 694.

{¶ 60} In considering claims of ineffective assistance of counsel, courts indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101. Harris contends his counsel was ineffective in failing to call its own expert witness to counter the expert testimony of Detective Vass.

{¶ 61} "Tactical or strategic trial decisions, even if ultimately unsuccessful, will not substantiate a claim of ineffective assistance of counsel." *State v. Ryan*, 10th Dist. No. 08AP-481, 2009-Ohio-3235, ¶ 77, citing *In re M.E.V.*, 10th Dist. No. 08AP-1097, 2009-Ohio-2408, ¶ 34. Generally, the decision to call a witness is a matter of trial strategy and, absent a showing of prejudice, does not deprive a defendant of the effective assistance of counsel. *State v. Roush*, 10th Dist. No. 12AP-201, 2013-Ohio-3162, ¶ 40, citing *State v. Samatar*, 152 Ohio App.3d 311, 2003-Ohio-1639, ¶ 90 (10th Dist.). "The failure to call an

expert witness and instead rely on cross-examination does not constitute ineffective assistance of counsel." *Id.*, citing *Samatar* at ¶ 90.

{¶ 62} Harris asserts his own expert could have responded to Detective Vass' testimony by explaining to the jury "how gang members conduct themselves, * * * how gang members are taught or threatened not to snitch, * * * and provide a host of other notable facts that could have gone a long way in explaining [Harris'] actions." (Harris' Brief at 12.) However, Harris does not identify an actual expert witness by name, nor does he point to an affidavit or other evidence in the record indicating what his expert would have said had he or she testified at trial. Thus, Harris' argument that his own expert would have helped his case is pure speculation. *Roush* at ¶ 41, citing *State v. Williams*, 10th Dist. No. 08AP-719, 2009-Ohio-3237, ¶ 35 (finding no evidence of prejudice resulting from trial counsel's failure to call a witness to testify where the defendant "did not submit an affidavit" from the witness, and the court did not know "the substance of [the witness'] testimony," thus rendering it "pure speculation to conclude that the result of appellant's trial would have been different had [the witness] testified").

{¶ 63} Accordingly, because Harris does not identify an actual expert witness, much less provide an affidavit or other evidence as to what the expert witness would have said if he testified, we cannot find the absence of the hypothetical expert witness' testimony prejudicially affected the outcome of Harris' trial. Harris did not receive ineffective assistance of counsel, and we overrule Harris' third assignment of error.

## VI.  Fourth Assignment of Error – Recording of Photo Array Identification

{¶ 64} In his fourth assignment of error, Harris argues the trial court abused its discretion when it permitted the state to play the recording of Collins' photo array identification. More specifically, Harris asserts the recording of the photo array identification contained inadmissible hearsay. Generally, the admission or exclusion of evidence lies in the sound discretion of the trial court. *State v. Darazim*, 10th Dist. No. 14AP-203, 2014-Ohio-5304, ¶ 33, citing *State v. Bartolomeo*, 10th Dist. No. 08AP-969, 2009-Ohio-3086, ¶ 24. An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 65} A statement is impermissible hearsay when it is an out-of-court statement offered for the truth of the matter asserted. Evid.R. 801(C) and 802. However, pursuant to Evid.R. 801(D)(1)(c), a statement is not hearsay if "[t]he declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * one of identification of a person soon after perceiving the person, if the circumstances demonstrate the reliability of the prior identification." Here, Collins testified at trial and was subject to cross-examination. Nonetheless, Harris argues the recording of the photo array identification was inadmissible because it did not demonstrate the reliability of the prior identification.

{¶ 66} Factors to consider in determining whether the circumstances demonstrate the reliability of the prior identification include " 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.' " *State v. Ingram*, 10th Dist. No. 06AP-984, 2007-Ohio-7136, ¶ 70, quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

{¶ 67} Harris argues the recording of the session is unreliable because Collins testified at an earlier proceeding that he was only 65 percent sure he had identified the correct person but, by the time of trial, testified he was 85 or 90 percent positive in his identification of Harris. However, Collins states in the audio recording he "remember[s] that face" and "remember[s] it clearly." He offered an explanation at trial for his change in certainty, testifying he has replayed the shooting in his mind and has been unable to get the image of Harris' face out of his thoughts. Collins' statement in the audio recording is that he remembers Harris' face clearly, and the trial court did not abuse its discretion in determining the recording of the photo array did not constitute inadmissible hearsay. *See Ingram* at ¶ 73 (concluding witness' pre-trial identification of defendant in a photo array did not constitute inadmissible hearsay).

{¶ 68} We overrule Harris' fourth assignment of error.

## VII. Fifth Assignment of Error – Interpretation of Audio Recording

{¶ 69} In his fifth assignment of error, Harris argues the trial court abused its discretion in allowing Detective Vass to testify regarding the jailhouse phone calls.

{¶ 70} Harris asserts a vague argument, without citation to any authority, that he received an unfair trial because the trial court allowed Detective Vass to "interpret" the recordings of the jailhouse phone calls. (Harris' Brief at 15.) However, as Harris notes, the phone calls were often times difficult to understand given the quality of the recording. Detective Vass, who testified both as an expert witness and as a lay witness, did not "interpret" the phone calls as Harris suggests, but instead offered a few words as to the focus of each conversation, indicating one related to "[a]libi," while another related to Harris conveying what he wanted witnesses to say he was wearing that night. (Tr. Vol. III at 507.)

{¶ 71} Pursuant to Evid.R. 701, opinion testimony by a lay witness is admissible regarding those opinions or inferences which are "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Detective Vass testified he was familiar with Harris, his testimony was rationally based on his perception of Harris and the phone calls, and his testimony was helpful to a clear understanding of a determination of the facts regarding the content of the jailhouse phone calls. Thus, though Harris does not articulate a specific legal argument regarding the admissibility of Detective Vass' testimony other than a broad allegation of the testimony being prejudicial, we conclude the testimony was admissible under Evid.R. 701. *See, e.g.*, *State v. Orlandi*, 10th Dist. No. 05AP-917, 2006-Ohio-6039, ¶ 20 (concluding a police officer's lay opinion that a scar on a face was consistent with being kicked by the heel of a boot was admissible under Evid.R. 701 because it was rationally based on the perception of the witness).

{¶ 72} To the extent Harris argues Detective Vass' testimony was needlessly duplicative of the actual audio recordings, we note Harris does not articulate or demonstrate any prejudice from the admission of the so-called duplicate evidence, nor does he challenge the admissibility of the recordings themselves. *See, e.g.*, *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, ¶ 32 (noting an improper evidentiary admission is harmless error "when, after the tainted evidence is removed, the remaining evidence is overwhelming").

{¶ 73} Accordingly, the trial court did not abuse its discretion in admitting Detective Vass' testimony regarding the jailhouse phone calls. We overrule Harris' fifth assignment of error.

## VIII.  Sixth Assignment of Error – Gang Specification

{¶ 74} In his sixth assignment of error, Harris argues the gang specification attached to the aggravated robbery and aggravated murder counts violates his First Amendment right to freedom of association. Harris did not raise this issue in the trial court. "A constitutional issue not raised at trial 'need not be heard for the first time on appeal.' " *State v. Douglas*, 10th Dist. No. 09AP-111, 2009-Ohio-6659, ¶ 61, quoting *State v. Awan*, 22 Ohio St.3d 120 (1986), syllabus. We decline to address Harris' constitutional argument regarding the gang specification because he failed to raise it in the trial court. Thus, we overrule Harris' sixth assignment of error.

## IX.  Seventh Assignment of Error – Motion for New Trial

{¶ 75} In his seventh and final assignment of error, Harris argues the trial court abused its discretion in denying his Crim.R. 33(A)(6) motion for new trial.

{¶ 76} The decision of whether to grant a new trial pursuant to Crim.R. 33 rests within the sound discretion of the trial court. *State v. Schiebel*, 55 Ohio St.3d 71 (1990), paragraph one of the syllabus. An appellate court reviews a trial court's determination of a Crim.R. 33 motion for an abuse of discretion. *Id.*; *State v. Townsend*, 10th Dist. No. 08AP-371, 2008-Ohio-6518, ¶ 8.

{¶ 77} A trial court may grant a new trial under Crim.R. 33(A)(6) "[w]hen new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at trial." The language of Crim.R. 33 makes it clear that a trial court should not grant a new trial " 'unless it affirmatively appears from the record that a defendant was prejudiced by one of the grounds stated in the rule, or was thereby prevented from having a fair trial.' " *Salinas* at ¶ 41, quoting *Columbus v. Carroll*, 10th Dist. No. 96APC01-90 (Aug. 27, 1996), citing Crim.R. 33(E).

{¶ 78} In order to warrant the granting of a motion for new trial in a criminal case based on newly discovered evidence, the defendant must show that the new evidence "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due

diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505 (1947), syllabus. *See also State v. Lee*, 10th Dist. No. 05AP-229, 2005-Ohio-6374, ¶ 9.

{¶ 79} Harris moved for a new trial on the basis of newly discovered evidence, alleging he had discovered the identity of the "true assailant," someone he identified as Dino. In denying Harris' motion for new trial, the trial court concluded Harris could not demonstrate that he could not, in the exercise of due diligence, have obtained this information prior to trial. Harris sought to introduce a recording allegedly of Dino's confession, but the trial court determined the recording could not be authenticated and contained inadmissible hearsay. However, even assuming for purposes of argument that the trial court should have considered the recorded confession, the trial court was within its discretion to deny the motion for new trial.

{¶ 80} As the trial court noted, even according to the affidavits of Harris' own witnesses, the recording containing an alleged confession was available as early as April 2014, well before the November 2014 start of Harris' trial. Though Harris asserts he did not pursue this evidence before trial because he did not want to be deemed a "snitch," Harris does not point to any authority indicating his fear of being a "snitch" somehow obviates the requirement that he exercise due diligence before trial. (Harris' Brief at 19.)

{¶ 81} Moreover, as the trial court noted, the evidence of a possible lead that Dino was the actual perpetrator is merely cumulative to the other evidence at trial. Detective Dennison testified that police investigated information regarding Dino but that the evidence led him to believe Harris was the correct suspect. The trial court also noted that Harris' testimony lacked credibility as it largely conflicted with a recorded interview he gave to police regarding whether he was at the scene of the crime and had witnessed another perpetrator. *See State v. Phillips*, 10th Dist. No. 14AP-362, 2014-Ohio-4947, ¶ 27 (concluding trial court did not abuse its discretion in denying defendant's motion for new trial where the trial court gave specific reasons it did not find a witness credible).

{¶ 82} The trial court articulated detailed, rational bases for concluding Harris' new evidence could have been discovered before trial in the exercise of due diligence, that it is merely cumulative, and that Harris lacked credibility as a witness. Having reviewed

the record of both the trial and the motion for new trial, we agree with the trial court's conclusions. Thus, trial court did not abuse its discretion in denying Harris' motion for new trial. We overrule Harris' seventh and final assignment of error.

## X. Disposition

{¶ 83} Based on the foregoing reasons, the sufficiency of the evidence and the manifest weight of the evidence support Harris' convictions, and Harris did not receive ineffective assistance of counsel. Additionally, the trial court did not err in not merging Harris' convictions of aggravated murder and aggravated robbery, the trial court did not err in imposing consecutive sentences, the trial court did not abuse its discretion in making its evidentiary rulings or in denying Harris' motion for new trial, and we decline to address Harris' constitutional argument. However, we must remand this matter for the trial court to correct the clerical error regarding its R.C. 2929.14(C)(4) findings. Having overruled Harris' seven assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, and we remand the matter to that court for the limited purpose of entering a nunc pro tunc entry reflecting the R.C. 2929.14(C)(4) findings the court made during the sentencing hearing.

*Judgment affirmed;*
*cause remanded with instructions.*

DORRIAN, P.J., and SADLER, J., concur.