[Cite as *State v. Watkins*, 2016-Ohio-8272.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 16AP-142 |
| | | (C.P.C. No. 14CR-2912) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Wendell X. Watkins, Sr., | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 20, 2016

**On brief**: *Ron O'Brien*, Prosecuting Attorney, and *Valerie B. Swanson*, for appellee. **Argued:** *Valerie B. Swanson*.

**On brief**: *Todd W. Barstow*, for appellant. **Argued**: *Todd W. Barstow*.

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Wendell X. Watkins, Sr., from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which the jury returned verdicts finding appellant guilty of aggravated burglary, aggravated robbery, and robbery, and the trial court separately found him guilty of having a weapon while under disability.

{¶ 2} On June 2, 2014, appellant was indicted on one count of aggravated burglary (Count 1), in violation of R.C. 2911.11, one count of aggravated robbery (Count 2), in violation of R.C. 2911.01, two counts of robbery (Counts 3 and 4), in violation of R.C. 2911.02, and one count of having a weapon while under disability (Count 5), in violation of R.C. 2923.13. Each of the first four counts contained a firearm specification.

{¶ 3}    The matter came for trial before a jury beginning January 4, 2016.  The first witness for plaintiff-appellee, State of Ohio, was David Hayes, age 32.  On the evening of October 20, 2012, Hayes met some friends at the Hollywood Casino in Columbus.  Hayes, who was playing blackjack, "started out with under a thousand [dollars], and by the end of the evening, around four [a.m.], [he] walked away with [$]35,800."  (Tr. Vol. II at 66.)

{¶ 4}    As Hayes "approached the 10,000 mark," other casino patrons "started paying attention.  They wanted to know how I was playing.  It just turned into a big show."  (Tr. Vol. II at 67.)  When Hayes was finished gambling, he "looked at one of the pit bosses, the gentleman that * * * oversees all the players and the dealers, and [Hayes] asked him if [he] could have an escort to the cashier."  (Tr. Vol. II at 68.)  Hayes asked for a security escort because he "had these giant trays full of bright orange neon chips, and there's about 200 people between me and the [cashier's] cage, so I just wanted to be safe."  (Tr. Vol. II at 68.)  Hayes stood in line waiting to cash his chips; when he reached the cashier, Hayes asked if he could "just have a check," but the cashier eventually handed him a manila envelope containing cash.  (Tr. Vol. II at 70.)

{¶ 5}    A security guard accompanied Hayes to his vehicle in the parking lot.  Hayes "wanted to get home as quickly as [he] could."  (Tr. Vol. II at 73.)  It was approximately 5:00 a.m., and there were not many other vehicles on the road.

{¶ 6}    Hayes took the Campus View Boulevard exit near his residence and did not believe anyone was following him.  He arrived home at approximately 5:20 a.m.  Hayes parked in the driveway, "went to go check the mail * * * and just went inside."  (Tr. Vol. II at 74.)  Hayes resided with his father and younger brother at a house on Glen Rock Drive, Westerville.  According to Hayes, "[w]e have a bad habit of not locking our doors."  His brother, who was attending "a festival * * * up north," was not at home that morning.  (Tr. Vol. II at 76.)

{¶ 7}    Hayes eventually went upstairs to bed.  He took the money out of the manila envelope and placed it on a bedroom stand "next to [his] alarm clock."  (Tr. Vol. II at 78.)  Hayes was half asleep when he "noticed two people coming in the room.  It wasn't a bust-the-door-open kind of a thing.  They just turned the knob, opened it up.  It was quiet.  I kind of opened my eyes to see what was going on, and I noticed * * * two people, and then immediately a gun was in my face."  The individuals were dressed in "[a]ll black from

head to toe, gloves, ski masks."  The only thing Hayes could see was "an opening around their eyes."  (Tr. Vol. II at 79.)

{¶ 8}   Hayes testified that one of the intruders "was white, and one was black." (Tr. Vol. II at 79.)  Hayes described the "white gentleman" as "really skinny.  He was behind the black gentleman, and he spent most of his time just kind of rooting through the room," while the "black gentleman seemed more muscular but still thin, fit."  (Tr. Vol. II at 79-80.)

{¶ 9}   The black male had a revolver and "was leaning over" Hayes, and he "pushed" the weapon into Hayes' forehead.  (Tr. Vol. II at 80.)  The black male "was doing all the talking.  He first asked * * * about the money.  Then he asked * * * where [Hayes'] brother was; is he a light sleeper; where's his gun?  He just kept repeating that over and over.  He seemed more concerned about that."  (Tr. Vol. II at 81.)  Hayes recalled a conversation he had earlier that morning at the casino when he told a security guard about his brother being "armed."  (Tr. Vol. II at 82.)

{¶ 10} The two intruders initially "just kept asking, 'Where's the money?' "  The men "later asked where the winnings were."  Hayes "lied to them," stating that the money was "out in the car."  Hayes eventually told them that the money was beside the alarm clock.  The white male "was opening up all the drawers and digging through everything," and Hayes "finally * * * had to pull [his] arm out from under the sheets and * * * point to where the money was, then he found the money."  (Tr. Vol. II at 83.)  The "first thing" the white male "said was, 'I thought there was more.' "  (Tr. Vol. II at 83-84.)  The white male "asked * * * where the rest of the money was," and Hayes "said, 'That's all the money.' And he's, like, 'How much did you win?'  I was, like, you know, '35,8. 35,8.' "  The white male then said: " 'That's about right.' "  The white male "took the cash and left."  (Tr. Vol. II at 84.)

{¶ 11} The white male walked out of the bedroom first.  Hayes testified that the black male "stayed, kept the gun to my head, then, out of nowhere, decided to pull the sheet over my head, so he pulled the sheet over my head and kept the gun pressed so I could feel it and just kept holding it there." Hayes wondered why the man was still standing there, and he thought the intruder "was going to pull the trigger."  Hayes then "felt the gun pull away," and he thought the man was gone.  (Tr. Vol. II at 84.)  As Hayes

was about to get out of bed, "the gun was pressed right up against [his] head again, and the gentleman said, 'I'm still here.' " (Tr. Vol. II at 85.)

{¶ 12} Hayes then heard the two men running down the stairs. Hayes looked downstairs toward the living room and observed "the back door was wide open." (Tr. Vol. II at 85.) Hayes' father "was already downstairs in the kitchen, [and] said he saw two people run out." (Tr. Vol. II at 85-86.) Hayes told his father what happened, and Hayes called 911. During Hayes' testimony, the state played a recording of the 911 call placed by Hayes that morning. The state also introduced surveillance video from the casino.

{¶ 13} Ronald Jones, age 29, testified on behalf of the state. Jones, whose nickname is "Hot Rod," has several theft-related convictions and is currently incarcerated in connection with the robbery of Hayes. (Tr. Vol. III at 176.) At trial, the state introduced a copy of a plea agreement Jones entered into with the state, under which he agreed to plead guilty to one count of aggravated burglary, a felony of the first degree, with a reduced firearm specification; under the terms, the parties would jointly recommend a ten-year prison sentence.

{¶ 14} Jones testified that he participated in the events at issue, along with Ryan Bundy, Ronald Heise, and appellant. Jones testified that Heise was a close friend and he described Heise as having blond hair, blue eyes, "about 290, 300 pounds." (Tr. Vol. III at 184.) Jones stated that Bundy was "[j]ust a friend," and he described Bundy as white and "[s]kinny." According to Jones, appellant was "one of my friends. He lived with me." (Tr. Vol. III at 185.) Appellant's girlfriend was Deanna McCutcheon.

{¶ 15} Jones testified that he often went to the casino to gamble and he acknowledged having "a gambling problem." (Tr. Vol. III at 186.) On the evening of October 20, 2012, Bundy gave Jones a ride to the casino. Over the prior 30 days, Jones had lost approximately $70,000 while gambling. Jones and a friend were standing in line, getting ready to cash out their winnings, when Jones "heard people talking" about their winnings. Jones observed individuals with orange chips, and he knew that "the orange chips are thousand-dollar chips." (Tr. Vol. III at 188.)

{¶ 16} As Jones and his friend were waiting in line, Jones' friend overheard that someone "won 40-something thousand." Jones phoned Heise "[a]nd I was, like, 'Man, there's other people up here winning. Dude hit like for 40.' [Heise] was like, 'Where he

at?'  I said, 'Sitting here in line.'  He was, like, 'Follow him.' "  (Tr. Vol. III at 189.)  Jones cashed in his chips, and remained near the line looking at the individual who had won the large amount.  Jones overheard the cashier say that the man was receiving a cash payout.

{¶ 17}  Jones walked outside the casino where Heise was waiting for him.  They both began smoking, and Bundy pulled up to the casino in a vehicle.  Jones observed Hayes get inside his vehicle and drive away.  Jones, Bundy, and Heise then followed Hayes in their vehicle.  The plan was to follow Hayes to his home and take the money from him before he entered his residence; Hayes, however, arrived home and went inside his house before they could confront him.

{¶ 18}  The three men returned to Jones' residence on Roys Avenue, located on the west side of Columbus; appellant, who resided with Jones, was also at the residence at the time.  Jones, Heise, Bundy, and appellant sat down in the kitchen and began to talk, and "Bundy is basically telling everybody, like, 'Damn, Bro. Like, we should have went in there and got it,' da, da, da."  Heise told Bundy: "Well, shit. You still can."  Bundy indicated he did not have anyone "to go in with me."  (Tr. Vol. III at 197.)  Bundy asked appellant if he was willing "to do it?"  Appellant inquired as to how much money was involved.  Bundy "tells him and everything," and appellant said: "Fuck it. We can do it. Fuck it."  (Tr. Vol. III at 198.)

{¶ 19}  Appellant pointed out that they did not have a weapon, but "Bundy said, 'I got a gun. I got a gun.' "  (Tr. Vol. III at 198.)  Bundy left the residence and returned about 30 minutes later with a .38 revolver.  Bundy drove Jones, Heise, and appellant back to the casino to pick up Heise's vehicle.  Heise and Jones got out of Bundy's vehicle at the casino, and Bundy drove off with appellant.

{¶ 20}  Jones testified that Bundy and appellant drove to Hayes' residence.  After retrieving Heise's vehicle at the casino, Heise and Jones decided to follow Bundy and appellant.  Jones and Heise drove past Hayes' house but they did not see Bundy or appellant.  After a short while, Jones observed Bundy's vehicle on the next street.  Jones and Heise sat in their vehicle for about ten minutes.  Jones testified that he received a call from his "baby's mom," and while he was talking to her he "missed like seven calls from [Bundy and appellant]."  (Tr. Vol. III at 202.)

{¶ 21} After realizing he had missed calls, Jones called "them back. I'm like, 'What's up?' " (Tr. Vol. III at 202.) Bundy told Jones they were about to leave. Bundy and appellant then drove up, and Bundy was "trying to show money and the pistol out the window, like, I told you I'd do it. I told you I'd do it." (Tr. Vol. III at 203.) Both vehicles then departed the residential area and Bundy drove to a location near downtown Columbus to drop off the weapon. All four individuals eventually returned to Jones' residence and divided the money.

{¶ 22} At trial, the state played a portion of the casino security video depicting Jones at the casino. The state also introduced telephone records from Jones' account.

{¶ 23} Columbus Police Detective Thomas Clark is currently assigned to the department's digital forensic unit, and performs forensic examinations on computers and cellular phones. In 2012, Detective Clark was assigned to the department's robbery squad. On the morning of October 21, 2012, Detective Clark interviewed Hayes at his residence following the report of a robbery. Detective Clark later met with security personnel at the Hollywood Casino. The detective reviewed casino surveillance video, and observed an individual "repeatedly on a cell phone," and who was "paying very serious attention" to Hayes. (Tr. Vol. III at 292.) Detective Clark was subsequently able to identify this person as Jones.

{¶ 24} Detective Clark ordered the cell phone records for Jones. The detective determined that the phone user for that account "was in the area using the cell tower and cell sector north of the Hollywood Casino between about 4:00 and 6:24 a.m. on the morning of the incident." (Tr. Vol. III at 294-95.) Detective Clark also determined that Jones' phone had communicated with towers "in the area of both [Route] 23 and [Route] 270 and a cell tower in the area of Campus View and Worthington Woods Boulevard, which would be just south of the crime [scene] itself." (Tr. Vol. III at 295.) The calls utilizing the tower near the crime scene were placed between 6:48 and 7:27 a.m.

{¶ 25} Detective Clark further determined that Jones had placed calls to three different numbers during the time period at issue. The detective identified one of the phone numbers as associated with an account belonging to appellant. Detective Clark identified calls placed by appellant's phone, occurring between 6:50 and 7:30 a.m., which utilized a tower near the crime scene.

{¶ 26} Detective Clark testified that charges were filed against Jones and appellant on January 7, 2013, and police officers arrested Jones the following day. Appellant was apprehended in Texas in May 2014 and extradited to Ohio.

{¶ 27} Following the presentation of evidence, the jury returned verdicts finding appellant guilty of one count of aggravated burglary, one count of aggravated robbery, and two counts of robbery. The jury also found appellant guilty of the corresponding firearm specifications. The weapon under disability count was tried separately to the trial court, and the court made a finding of guilty as to that count. For purposes of sentencing, the trial court merged the robbery counts with the aggravated robbery count.

{¶ 28} By judgment entry filed January 26, 2016, the trial court sentenced appellant to 7 years each as to the aggravated burglary and aggravated robbery counts, 36 months as to the weapon under disability count, as well as an additional 3 years each for the firearm specifications on Counts 1 and 2. The court ordered the sentences for the aggravated burglary count and the aggravated robbery count to be served consecutive to each other but concurrent to the weapon under disability count.

{¶ 29} On appeal, appellant sets for the following two assignments of error for this court's review:

> I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF AGGRAVATED BURLGARY; AGGRAVATED ROBBERY; ROBBERY; AND HAVING WEAPONS UNDER DISABILITY AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> II. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY IMPROPERLY SENTENCING HIM TO CONSECUTIVE TERMS OF INCARCERATION IN CONTRAVENTION OF OHIO'S SENTENCING STATUTES.

{¶ 30} Under his first assignment of error, appellant challenges his convictions as not supported by sufficient evidence and as against the manifest weight of the evidence. Appellant's primary contention is that the testimony of Jones was not reliable.

{¶ 31} When a defendant challenges the sufficiency of the evidence, an appellate court "construes the evidence in favor of the prosecution and determines whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt." *State v. Hill,* 10th Dist. No. 07AP-889, 2008-Ohio-4257, ¶ 41. In conducting such a review, "an appellate court does not engage in a determination of witness credibility, rather it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime." *Id.*

{¶ 32} By contrast, in considering a manifest weight challenge, "an appellate court engages in a limited weighing of the evidence to determine whether the fact finder's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt." *Id.* at ¶ 42. A reviewing court "may not merely substitute its view for that of the trier of fact" but, instead, must "review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Vasquez,* 10th Dist. No. 13AP-366, 2014-Ohio-224, ¶ 49.

{¶ 33} R.C. 2911.11(A) defines the offense of aggravated burglary, and states in part:

> No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply:
>
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
>
> (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

{¶ 34} R.C. 2911.01(A)(1) defines the offense of aggravated robbery in part as follows: "No person, in attempting or committing a theft offense * * * shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."

{¶ 35} As noted, appellant was also charged with having a weapon while under disability.   R.C. 2923.13(A)(2) states in part: "Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry or use any firearm or dangerous ordnance if * * * [t]he person is under indictment for or has been convicted of any felony offense of violence."

{¶ 36} We first consider appellant's sufficiency challenge.   At trial, the state presented evidence indicating that, in the early morning hours of October 21, 2012, Hayes won approximately $35,0oo playing blackjack at the Hollywood Casino.  Security video from the casino depicted Hayes carrying a tray of orange chips to the counter; Jones was identified on the video as observing Hayes standing in line.  Hayes received $35,800 in cash for his winnings and a security guard escorted Hayes to his vehicle.  Hayes then drove to his residence.

{¶ 37} Upon arriving home, Hayes eventually went to bed.  A short time later, two individuals entered his bedroom.  Hayes described one of the intruders as a skinny white male, and the other as a black male.  The black male was holding a revolver, and he pointed the revolver at Hayes' head during the incident.  The men asked Hayes where the money was located.   After finding the money, the men left the residence and Hayes immediately contacted the police.

{¶ 38} Jones testified that he participated in the events at issue along with Bundy, Heise, and appellant.  Jones acknowledged he was depicted on the casino security video watching Hayes standing in line to cash his chips.  Jones overheard Hayes mention that his brother had a concealed carry permit.  Jones, who had phoned Heise to inform him of Hayes' large winnings, met Heise outside the casino.   Jones, Heise, and Bundy subsequently followed Hayes' vehicle as it left the casino parking lot; the men planned to follow Hayes home and take the money from him before he entered his residence.  The three men arrived too late, however, and Hayes parked his vehicle and entered his house without incident.

{¶ 39} Jones, Heise, and Bundy returned to Jones' residence, where appellant was staying at the time.  Jones testified that the men discussed the evening's events, and Heise encouraged Bundy to go back to the residence; Bundy asked appellant about accompanying him, and appellant agreed to go.  Bundy obtained a weapon, and Bundy

and appellant drove to Hayes' residence. Jones and Heise followed them in a separate vehicle, remaining inside their vehicle near the residence. A short time later, Bundy and appellant drove away from Hayes' residence with the money.

{¶ 40} Here, the state presented evidence which, if believed, indicated that appellant and Bundy entered Hayes' residence in the early morning hours of October 21, 2012, that appellant brandished a weapon during the incident, and that the two intruders left the residence with Hayes' cash winnings from the casino. On review, the state presented sufficient evidence to support the elements of aggravated burglary, aggravated robbery, and having a weapon while under disability beyond a reasonable doubt.[1]

{¶ 41} Appellant's primary argument is that his convictions are against the manifest weight of the evidence. Specifically, appellant contends that the testimony of Jones was not credible. Appellant depicts Jones as a career criminal and argues that he exchanged information in return for a lighter sentence. Appellant further argues that Jones acknowledged he would not have testified against his friend Heise, but that he willingly testified against others to protect Heise.

{¶ 42} With respect to Jones' purported allegiance to Heise, the state responds that Jones testified as to Heise's involvement in the events at issue. On review, we agree. The record indicates that Jones testified that Heise instructed him to follow Hayes at the casino and that Heise arrived at the casino a short time later to meet Jones. According to Jones, Heise encouraged Bundy to return to Hayes' residence after the initial failed attempt to follow Hayes home and rob him before he entered his house. According to Jones, Heise "is the one that kept * * * pushing them to do it." (Tr. Vol. III at 217.) Jones believed Heise was "more guilty because he's the one that pushed it on." Jones portrayed Heise's role as "the brains of the operation." (Tr. Vol. III at 241-42.)

{¶ 43} As also noted by the state, Heise did not match the description of either of the intruders. Specifically, Hayes testified that one of the intruders was white and skinny, while the other was black. At trial, Jones testified that Heise was a white male who

---

[1] With respect to the weapon under disability count, tried separately to the court, the state introduced evidence as to appellant's prior conviction for robbery in case No. 02CR-1103, as well as a copy of appellant's indictment in case No. 11CR-2915, charging him with one count of aggravated burglary, with a firearm specification, one count of aggravated robbery, with a firearm specification, two counts of robbery, each with a firearm specification, one count of kidnapping, with a firearm specification, and one count of having a weapon while under disability.

weighed approximately 300 pounds, while Jones described Bundy as "[w]hite" and "[s]kinny." (Tr. Vol. III at 185.) Jones further testified that appellant was a friend of his and the evidence indicated that appellant and his girlfriend resided with Jones. Based on the record presented, appellant's contention that Jones falsely implicated him simply to protect Heise is unpersuasive.

{¶ 44} Further, the jury in this case had the opportunity to assess the credibility of the witnesses, including Jones, and the trier of fact was free to "believe or disbelieve all or any of the testimony" presented. *State v. Webb,* 10th Dist. No. 10AP-189, 2010-Ohio-5208, ¶ 16. In addition, the state presented phone records of both Jones and appellant indicating cell phone calls associated with those accounts utilizing a cell tower in the vicinity of the crime scene during the relevant time period. On review, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice in returning the guilty verdicts. Accordingly, the convictions are not against the manifest weight of the evidence.

{¶ 45} Having found that appellant's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence, appellant's first assignment of error is overruled.

{¶ 46} Under his second assignment of error, appellant asserts the trial court erred in imposing consecutive sentences by failing to make requisite findings at the sentencing hearing as required by R.C. 2929.14(C)(4) and based on the standard set forth by the Supreme Court of Ohio in *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177. More specifically, appellant contends the trial court failed to make a finding that consecutive sentences were not disproportionate to the danger he posed to the public.

{¶ 47} R.C. 2929.14(C)(4) states:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

No. 16AP-142 12

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 48} Thus, prior to imposing consecutive sentences, R.C. 2929.14(C)(4) requires a trial court to find that: "(1) consecutive sentences are necessary to protect the public from future crime or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) at least one of the factors enumerated in R.C. 2929.14(C)(4)(a)-(c) applies." *State v. Smith*, 8th Dist. No. 101105, 2014-Ohio-5547, ¶ 7.

{¶ 49} In *Bonnell* at ¶ 29, the Supreme Court, in construing the language of R.C. 2929.14(C)(4), held in part: "When imposing consecutive sentences, a trial court must state the required findings as part of the sentencing hearing, and by doing so it affords notice to the offender and to defense counsel." Further, "because a court speaks through its journal, * * * the court should also incorporate its statutory findings into the sentencing entry." The Supreme Court made clear, however, that "a word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Id.*

{¶ 50} In the present case, the trial court stated during the sentencing hearing that, "[p]ursuant to [R.C.] 2929.14(C)(4), I find that consecutive sentences are warranted under the circumstances, especially, due to the nature." The court further found that "one sentence is insufficient to adequately punish the defendant, nor is it disproportionate

based upon his record."  Finally, the court noted the fact that appellant "was pending on bond when these offenses occurred."  (Tr. Vol. V at 474.)

{¶ 51} On review, we find the trial court's findings were sufficient to satisfy the requirements of R.C. 2929.14(C)(4).  As cited above, under *Bonnell* at ¶ 29, "a word-for-word recitation of the language of the statute is not required."  While appellant challenges the trial court's finding that consecutive sentences are not "disproportionate based upon his record," other appellate courts have deemed similar language sufficient to comply with R.C. 2929.14(C)(4).  *State v. Moore,* 8th Dist. No. 99788, 2014-Ohio-5135, ¶ 25 (noting that "[r]egarding the [trial] court's statement, 'I do not find it's disproportionate,' similar language has been deemed sufficient to constitute a finding that consecutive sentences are not disproportionate to the seriousness of a defendant's conduct and to the danger he poses to the public").  *See also State v. Plymale,* 4th Dist. No. 15CA1, 2016-Ohio-3340, ¶ 56 (noting that *Bonnell* does not require a word-for-word recitation of statute, and holding that trial court's finding that consecutive sentences "are not disproportionate" was sufficient to comply with R.C. 2929.14(C)(4) where record indicated trial court identified all three of the factors listed in statute);  *State v. Thompson,* 7th Dist. No. 05 JE 16, 2005-Ohio-6792, ¶ 57 (trial court's finding that "consecutive sentences * * * are not disproportionate" sufficient to recite second consecutive sentencing factor as talismanic language not required).

{¶ 52} On review, we conclude the trial court made the requisite statutory findings to impose consecutive sentences and that the record contains evidence to support those findings.  Accordingly, appellant's second assignment of error is not well-taken and is overruled.

{¶ 53}  Based on the foregoing, appellant's two assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

SADLER and HORTON, JJ., concur.

_____