[Cite as *State v. Ross*, 2025-Ohio-2875.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 24AP-613 |
| | | (C.P.C. No. 22CR-5503) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Keimariyon M. Ross, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on August 14, 2025

**On brief**: *Shayla D. Favor*, Prosecuting Attorney, and *Michael A. Walsh*, for appellee. **Argued:** *Michael A. Walsh*.

**On brief**: *Brian J. Rigg* for appellant.

APPEAL from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1} Defendant-appellant, Keimariyon M. Ross, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty of murder, attempted murder, felonious assault, and improperly handling a firearm in a motor vehicle. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} By indictment filed November 22, 2022, plaintiff-appellee, State of Ohio, charged Mr. Ross with one count of purposeful murder in violation of R.C. 2903.02, an unclassified felony; one count of felony murder in violation of R.C. 2903.02, an unclassified felony; three counts of attempted murder in violation of R.C. 2923.02 and 2903.02, felonies of the first degree; three counts of felonious assault in violation of R.C. 2903.11, felonies of

the second degree; and one count of improperly handling a firearm in a motor vehicle in violation of R.C. 2923.16, a felony of the fourth degree. The murder, attempted murder, and felonious assault charges each contained accompanying three-year firearm specifications pursuant to R.C. 2941.145(A) and five-year drive by shooting specifications pursuant to R.C. 2941.146(A). Mr. Ross entered a plea of not guilty. Prior to trial, Mr. Ross submitted a notice of self-defense pursuant to Crim.R. 12.2.

{¶ 3} At a jury trial beginning July 22, 2024, D.M. testified that on October 29, 2022, a group of four friends traveled from Youngstown State University to Columbus to attend a Halloween party near The Ohio State University. (Tr. at 50.) The four friends—D.M., K.S., M.V., and J.K.—drove to Columbus in a black Mitsubishi SUV. (Tr. at 50-52.) During the early morning hours of October 30, 2022, the four friends stopped at the Sheetz gas station on North Cassady Avenue to get some gas. (Tr. at 55.) Once in the Sheetz parking lot, D.M. heard a noise that he initially thought sounded like drums or fireworks. (Tr. at 57.) M.V. recognized the sound to be gunshots. (Tr. at 71.) D.M. started to drive away as quickly as he could when he heard a noise so loud it caused him to close his eyes. (Tr. at 58.) J.K. testified he heard a window shatter in the vehicle. (Tr. at 86.) After the loud noise, D.M., M.V., and J.K. realized K.S., who was sitting in the front passenger seat of the vehicle, had been shot in the head. (Tr. at 58-59, 74, 86.)

{¶ 4} D.M. testified he immediately drove to a nearby hospital while J.K. attempted to position K.S.'s head so that he could continue breathing. (Tr. at 59-60, 88.) K.S. died at the hospital from the gunshot wound to his head. (Tr. at 61, 147.)

{¶ 5} Sheetz maintained a multi-camera video surveillance system that recorded the events of October 30, 2022. (Tr. at 158.) The parties stipulated that Mr. Ross was depicted in the surveillance video. (Tr. at 159.) The state played the surveillance footage for the jury. (Tr. at 183-205; State's Ex. V-2, V-3.) The footage shows Tyyaun Sullivan and two women inside Sheetz. (Tr. at 222-23; State's Ex. V-6 at 0:00-10:45.) While Mr. Sullivan was inside Sheetz, a light-colored vehicle parked at the gas pumps and several people, including Mr. Ross, exited the vehicle. (Tr. at 224-25; State's Ex. V-2 at 0:10-1:40.) Scott Polgar, a detective with the Columbus Division of Police, testified that his investigation revealed at least one person in Mr. Ross's group had an "unfriendly history" with Mr. Sullivan. (Tr. at 229.) The surveillance footage shows Mr. Ross and his group

walk into Sheetz and walk past Mr. Sullivan's table. (Tr. at 229-30; State's Ex. V-1 at 10:30-11:00.) At that point, Mr. Sullivan stood up and moved toward the food counter, and Mr. Ross and some of his group exited the store. (Tr. at 230, 233; State's Ex. V-1 at 10:45-11:30.)

{¶ 6} Another vehicle then arrived at Sheetz and parked next to the car in which Mr. Ross had arrived. (Tr. at 232-33; State's Ex. V-2 at 2:45-3:00.) The individuals in Mr. Ross's group who had left the store, including Mr. Ross, could be seen returning to their vehicle, reaching inside but not fully reentering the vehicle, and communicating with the people in the second car. (Tr. at 233; State's Ex. V-2 at 3:25-4:10.) Mr. Ross and the individuals in his group then began walking back inside the store. (Tr. at 235-37; State's Ex. V-3 at 3:00-3:15; State's Ex. V-5 at 3:00-3:20.) Detective Polgar testified Mr. Ross and his group exhibited body language that suggested they were carrying concealed weapons. (Tr. at 235-38, 246-47.) Individuals from the second car also entered the store. (Tr. at 245-46; State's Ex. V-1 at 13:00-13:20.)

{¶ 7} As Mr. Ross's group arrived inside Sheetz, Mr. Sullivan and his group hurriedly exited the store and entered a black four-door sedan parked directly outside the store. (Tr. at 234-35, 249, 251; State's Ex. V-3 at 3:35-4:05; State's Ex. V-4 at 3:35-3:45; State's Ex. V-6 at 13:25-13:35.) The driver of the black four-door sedan then reversed out of the parking spot. (Tr. at 249; State's Ex. V-3 at 4:10-4:15.) Some members of Mr. Ross's group, including a man identified as Mr. Ross's cousin, stood inside the store vestibule with guns drawn and began to walk outside. (Tr. at 250-251, 255-56; State's Ex. V-3 at 4:15-4:25; State's Ex. V-4 at 4:15-4:25.) Mr. Sullivan then leaned out the passenger side of the black four-door sedan and began firing a gun toward the front door of Sheetz. (Tr. at 252; State's Ex. V-2 at 6:00-6:05.) At least one person from Mr. Ross's group—who was in the second car still parked at the pump—returned fire. (Tr. at 252-53; State's Ex. V-2 at 6:05-6:20.) Detective Polgar testified that the surveillance video confirmed Mr. Ross's cousin brandished a firearm first, but Mr. Sullivan fired the first shot. (Tr. at 272, 274.) Michael Huffman, a detective with the Columbus Division of Police, testified there were at least five different people firing weapons. (Tr. at 204-05.)

{¶ 8} During this initial exchange of gunfire, Mr. Ross was still inside Sheetz getting a drink. (Tr. at 253-54; State's Ex. V-5 at 3:45-4:20.) When the gunfire erupted, several other patrons of the store ran away from the entrance and further into the store.

(Tr. at 254; State's Ex. V-5 at 4:10-4:20; State's Ex. V-1 at 14:20-14:40.) Mr. Ross did not retreat further into the store with the other patrons. (State's Ex. V-5 at 4:15-4:20; State's Ex. V-2 at 6:25-6:35.) The video showed Mr. Ross step back, take a drink of his beverage, and then exit the store. (Tr. at 254-56; State's Ex. V-5 at 4:15-4:20; State's Ex. V-2 at 6:25-6:35.) Mr. Ross ran with another member of his group toward their vehicle, then turned and fired a gun toward the building. (Tr. 256-57; State's Ex. V-2 at 6:25-6:40; State's Ex. V-3 at 4:35-4:50.) After firing his weapon, Mr. Ross got into the backseat of the second-arriving vehicle, not the vehicle in which he arrived. (Tr. at 257-58; State's Ex. V-2 at 6:35-6:40.)

{¶ 9} Once Mr. Ross was inside the second-arriving vehicle, the surveillance footage shows the SUV carrying the four friends from Youngstown State University driving along the back of the parking lot. (Tr. at 257-58; State's Ex. V-2 at 6:35-6:40.) Two individuals from Mr. Ross's group ran near the SUV before entering the backseat of the second-arriving vehicle with Mr. Ross. (Tr. at 258-60; State's Ex. V-2 at 6:35-6:43; State's Ex. V-3 at 4:50-5:00.) Mr. Ross then opened the rear passenger door, stood inside the door, aimed his firearm over the top of the car door, and fired at the SUV carrying the four friends from Youngstown State University as it was driving away. (Tr. at 259; State's Ex. V-2 at 6:40-6:55.)

{¶ 10} Detective Polgar testified law enforcement was able to identify Mr. Ross from the surveillance footage and filed a warrant for his arrest. (Tr. at 260-61.) Mr. Ross turned himself in to police several days later. (Tr. at 262, 269.)

{¶ 11} Mr. Ross, who was 18 years old at the time of the October 30, 2022 shooting, testified in his own defense. (Tr. at 289.) Mr. Ross testified he had been shot and injured in a drive-by shooting just a year earlier, when he was 17 years old, causing him to become very anxious. (Tr. at 294-302.) As a result, Mr. Ross testified he decided to obtain a firearm for protection, and he carried the gun with him in his pants. (Tr. at 302-04.)

{¶ 12} On the evening of October 29, 2022, Mr. Ross said he left his house around 11:00 pm to attend a party with his cousin, one of the individuals in his group at Sheetz. (Tr. at 306-07.) Mr. Ross testified he rode to the party with his cousins, and he brought his firearm with him to the party. (Tr. at 307-08.) When they left the party, Mr. Ross testified he and his group went to Sheetz to get food and drinks. (Tr. at 309-13.) Mr. Ross testified

he had never seen or met Mr. Sullivan before but he noticed inside Sheetz that Mr. Sullivan had a gun on his waist. (Tr. at 316.) Mr. Ross said one of his cousins told him about a prior argument with Mr. Sullivan, but Mr. Ross said he was not concerned about it and left the store to get money out of the car. (Tr. at 317-18.)

{¶ 13} When he reentered Sheetz, Mr. Ross said he saw Mr. Sullivan immediately stand up. (Tr. at 320-21.) Mr. Ross testified he went to get something to drink and watched Mr. Sullivan quickly exit the store and get "into a black four-door car." (Tr. at 323.) Mr. Ross said he then heard a "boom" and realized it was a gunshot. (Tr. at 324.) After hearing additional gunshots, Mr. Ross said he saw his cousin—who Detective Polgar had identified as having first brandished a gun in the store's vestibule—on the ground. (Tr. at 325.) Mr. Ross testified he pulled out his gun and went outside to protect his cousin but that when he asked his cousin if he was okay, his cousin did not respond. (Tr. at 327.) Mr. Ross testified he began running and ducking as he heard additional gunshots, and he testified he was scared and wanted to leave. (Tr. at 327-28.)

{¶ 14} Mr. Ross said he ran toward the vehicle his cousin arrived in and heard another gunshot, so he fired his gun into the air, intending it to be a warning shot. (Tr. at 329.) Mr. Ross got into the rear passenger-side seat of the car and heard tires screeching. (Tr. at 330-31.) When he looked up, Mr. Ross said he saw "a black car flying around" and thought it was the same vehicle that had been shooting at his group. (Tr. at 331-32.) At that point, Mr. Ross said, "[i]mmediately I get -- I stand on, inside the car but open the door, and I fire shots at the car in fear of losing my life or losing a friend's life or family member's life." (Tr. at 332.) Mr. Ross testified he believed the other vehicle was either next to him or moving away from him, but he thought it was possible the occupants of the other vehicle were still shooting at his group. (Tr. at 332-33.) Mr. Ross testified he was unsure how many shots he fired, but he fired until he felt like it was "enough." (Tr. at 333-34.)

{¶ 15} The next day, Mr. Ross learned someone had been killed at Sheetz. (Tr. at 336.) Mr. Ross testified he did not know who had died or that he had caused the death. (Tr. at 337.) Eventually, Mr. Ross said he learned there was a warrant for his arrest, and he obtained an attorney and turned himself into law enforcement. (Tr. at 338-40.)

{¶ 16} Mr. Ross made a Crim.R. 29 motion for acquittal both at the conclusion of the state's evidence and at the conclusion of the defense's evidence. (Tr. at 284, 382.) The trial court denied both Crim.R. 29 motions. (Tr. at 286, 383.)

{¶ 17} Following deliberations, the jury found Mr. Ross guilty of all nine counts and accompanying specifications. (Tr. at 497-503.) The trial court conducted a sentencing hearing on September 5, 2024 and sentenced Mr. Ross to an aggregate term of a minimum of 32 years to life in prison up to a possible maximum of 35 years to life in prison. (Sentencing Tr. at 41-46.) The trial court journalized Mr. Ross's convictions and sentence in a September 10, 2024 judgment entry. Mr. Ross timely appeals.

## II. Assignments of Error

{¶ 18} Mr. Ross raises the following two assignments of error for our review:

> [I.] The trial court erred when it denied Mr. Keimariyon M. Ross 29 Motion for Acquittal.
>
> [II.] The verdicts of guilt as to the convictions of Murder, ,Attempted Murder, Felonious Assault, Improperly Handling a Firearm in a Motor Vehicle.

(Sic passim.)

## III. First Assignment of Error—Crim.R. 29 Motion for Acquittal

{¶ 19} In his first assignment of error, Mr. Ross argues the trial court erred in denying his Crim.R. 29 motion for acquittal.

{¶ 20} Crim.R. 29(A) states, in pertinent part: "The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment . . . if the evidence is insufficient to sustain a conviction of such offense or offenses." We review a trial court's ruling on a Crim.R. 29(A) motion and an assignment of error challenging sufficiency of the evidence under the same standard. *State v. Abdullahi*, 2024-Ohio-418, ¶ 22 (10th Dist.), citing *State v. Fugate*, 2013-Ohio-79, ¶ 5 (10th Dist.).

{¶ 21} Whether the evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state met its burden of production at trial. *See, e.g., State v. Smith*, 2004-Ohio-4786, ¶ 16 (10th Dist.); *State v. Frazier*, 2007-Ohio-11, ¶ 7

(10th Dist.); *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). We do not weigh the evidence but instead determine " 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 22} In evaluating a sufficiency challenge, we assume the state's witnesses testified truthfully and determine if that testimony and any other evidence presented at trial satisfied each element of the offense. *State v. Watkins*, 2016-Ohio-8272, ¶ 31 (10th Dist.), quoting *State v. Hill*, 2008-Ohio-4257, ¶ 41 (10th Dist.). Thus, evidence is sufficient to support a conviction where, if believed, that evidence would allow any rational trier of fact to conclude the state proved each element of the offense beyond a reasonable doubt. *Frazier* at ¶ 7, citing *Jenks* at paragraph two of the syllabus.

{¶ 23} Mr. Ross was convicted of murder, attempted murder, felonious assault, and improperly handling a firearm in a motor vehicle. Throughout his sufficiency of the evidence argument, Mr. Ross repeatedly refers to his claim of self-defense. In Ohio, self-defense is an affirmative defense, and "an affirmative defense is not an element of a crime." *State v. Messenger*, 2022-Ohio-4562, ¶ 24. Thus, a defendant claiming self-defense "has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense." *Id*. at ¶ 25. Stated another way, the state's "burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest weight review on appeal," not a sufficiency of the evidence review. *Id*. at ¶ 27. "Because the state's burden is only one of persuasion—and not production—an appellate court cannot review a self-defense claim under the sufficiency of the evidence standard." *State v. Blacker*, 2024-Ohio-5611, ¶ 101 (10th Dist.), citing *Messenger* at ¶ 26-27.

{¶ 24} Mr. Ross further argues his claim of self-defense demonstrates the state did not put forth sufficient evidence on the applicable mens rea of each offense. Again, however, this argument is more properly understood as a challenge to the manifest weight of the evidence, the subject of Mr. Ross's second assignment of error. *See State v. Patterson*, 2025-Ohio-280, ¶ 38 (10th Dist.), quoting *Messenger* at ¶ 27 (" 'The state's new burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal.' "); *State v. Ferrell*, 2020-Ohio-6879, ¶ 54

(10th Dist.), citing *State v. Kurtz*, 2018-Ohio-3942, ¶ 21 (10th Dist.) ("the manifest-weight standard is the proper standard of review" for a defendant's contention that the evidence supports a claim of self-defense "because a defendant claiming self-defense does not seek to negate an element of the offense charged but rather seeks to relieve himself [of] culpability"); *State v. Bankston*, 2009-Ohio-754, ¶ 4 (10th Dist.) ("in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). Thus, so long as the state presented evidence that, if believed, demonstrates every element of the offenses charged, the convictions are supported by sufficient evidence. Accordingly, we examine each offense individually to determine whether there is sufficient evidence to support the conviction.

### A. Purposeful Murder

{¶ 25} Mr. Ross was convicted of one count of purposeful murder related to K.S. Pursuant to R.C. 2903.02(A), "[n]o person shall purposely cause the death of another." "A person acts purposely when it is the person's specific intention to cause a certain result." R.C. 2901.22(A). The state can establish purpose or intent by circumstantial evidence and through the surrounding facts and circumstances. *State v. McCall*, 2021-Ohio-1032, ¶ 20 (10th Dist.); *State v. Harris*, 2016-Ohio-3424, ¶ 21 (10th Dist.), citing *State v. Loughman*, 2011-Ohio-1893, ¶ 47 (10th Dist.), citing *State v. Grant*, 67 Ohio St.3d 465, 478 (1993). ("A jury may consider the entire set of circumstances surrounding the shooting and infer the defendant's intent based on those facts.").

{¶ 26} "When a person fires a gun into a group of people, one can infer intent to cause death." *State v. Hubbard*, 2013-Ohio-2735, ¶ 23 (10th Dist.). *See State v. Scales*, 2024-Ohio-2171, ¶ 22-23 (8th Dist.). Both the surveillance video and Mr. Ross's own testimony established Mr. Ross fired his gun at K.S.'s vehicle. The surveillance footage shows Mr. Ross standing in or on the door frame of his vehicle, extending his arm over the door, and firing his gun at the SUV. Thus, the jury could reasonably infer Mr. Ross purposely caused K.S.'s death when he fired his gun at the SUV. Accordingly, there was sufficient evidence to support Mr. Ross's purposeful murder conviction.

### B. Attempted Murder

{¶ 27}  The jury also convicted Mr. Ross of three counts of attempted murder related to D.M., M.V., and J.K.  To convict Mr. Ross of attempted murder, the state was required to prove Mr. Ross purposely or knowingly engaged in conduct which, if successful, would have purposely caused the death of another.  *See* R.C. 2923.02(A) and 2903.02.  The victim need not sustain any injuries; rather, "it is the 'intent of the accused, not the result, [which] is determinative.' "  *State v. Nuh*, 2010-Ohio-4740, ¶ 26 (10th Dist.), quoting *State v. Locklear*, 2006-Ohio-5949, ¶ 17 (10th Dist.).

{¶ 28}  As discussed in our consideration of Mr. Ross's murder conviction, the surveillance video showed, and Mr. Ross testified, that he fired his gun at the SUV carrying D.M., M.V., and J.K.  The jury could reasonably infer Mr. Ross acted purposely with the intent to cause death when doing so.  *Hubbard* at ¶ 23; *Scales* at ¶ 22-23.  Thus, there was sufficient evidence to support Mr. Ross's attempted murder convictions.

### C. Felonious Assault

{¶ 29}  The jury additionally convicted Mr. Ross of three counts of felonious assault related to D.M., M.V., and J.K.  Under R.C. 2903.11(A)(2), no person shall knowingly "[c]ause or attempt to cause physical harm to another . . . by means of a deadly weapon or dangerous ordnance."  Under R.C. 2901.22(B), "[a] person acts knowingly, regardless of [his] purpose, when [he] is aware that [his] conduct will probably cause a certain result or will probably be of a certain nature."

{¶ 30}  "Evidence that a defendant fired a gun in the direction of the victim is sufficient evidence that the defendant acted knowingly for purposes of a conviction of felonious assault."  *State v. Wade*, 2023-Ohio-3490, ¶ 39 (10th Dist.), citing *State v. Fox*, 2018-Ohio-501, ¶ 14 (10th Dist.).  The surveillance footage showed Mr. Ross firing his gun at the vehicle containing the four friends from Youngstown State University.  Mr. Ross also testified he fired his gun at the vehicle.  This evidence was sufficient to support  a finding that Mr. Ross acted knowingly when he fired his gun, substantiating his convictions of felonious assault.  *Id.* at ¶ 39; *State v. Wilson*, 2024-Ohio-776, ¶ 24 ("intentionally firing a weapon in the direction of another person is sufficient to meet the 'knowingly' element of

the felonious-assault statute"). We therefore find there was sufficient evidence to support Mr. Ross's felonious assault convictions.

### D. Felony Murder

{¶ 31} The jury also convicted Mr. Ross of one count of felony murder. In order to convict a defendant of felony murder, in violation of R.C. 2903.02(B), the state must prove the defendant caused the death of another "as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." Felonious assault is an offense of violence. R.C. 2901.01(A)(9)(a). In Ohio, felony murder is a strict liability offense because although "intent to commit the predicate felony is required, intent to kill is not." *State v. Nolan*, 2014-Ohio-4800, ¶ 9. *See State v. Miller*, 2002-Ohio-4931, ¶ 33 (explaining the defendant was guilty of felonious assault because he knowingly caused physical harm to the victim by firing a gun at her, and "[t]he fact that she died from her injuries ma[de] him guilty of felony murder, regardless of his purpose").

{¶ 32} As discussed above, there was sufficient evidence that Mr. Ross committed felonious assault against the occupants of the SUV. To the extent Mr. Ross argues there was insufficient evidence that his gunshots were the ones that hit the SUV, the video showed Mr. Ross get out of his vehicle and shoot in the direction of the SUV as it drove past. Investigators recovered shell casings from inside the victims' SUV that were consistent with Mr. Ross's firearm. (Tr. at 132-33, 187-88.) Mr. Ross also admitted he shot at the SUV. Thus, there was sufficient evidence to support Mr. Ross's felony murder conviction.

### E. Improper Handling of Firearm in a Motor Vehicle

{¶ 33} The jury also convicted Mr. Ross of one count of improper handling of a firearm in a motor vehicle. Pursuant to R.C. 2923.16(B), "[n]o person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle." Mr. Ross argues there was no evidence demonstrating he possessed a firearm in a way that it was accessible to the operator or a passenger of the vehicle.

{¶ 34} Detective Polgar testified that Mr. Ross possessed a firearm while inside Sheetz, fired the weapon in the direction of the building, got into a vehicle, then, while

standing on the vehicle's door, fired the gun at the victims' SUV. The surveillance video corroborated Detective Polgar's testimony. Mr. Ross also admitted to carrying the loaded weapon in the passenger compartment of the vehicle throughout the events. This evidence demonstrates Mr. Ross carried a loaded firearm into the vehicle and that it was accessible to a passenger of the vehicle. Thus, there was sufficient evidence to support Mr. Ross's conviction of improper handling of a firearm in a motor vehicle.

### F. Specifications

{¶ 35} Lastly under this assignment of error, the jury convicted Mr. Ross of the accompanying three-year and five-year firearm specifications attached to the convictions of purposeful murder, felony murder, attempted murder, and felonious assault. To prove the three-year firearm specification, the state had to prove Mr. Ross possessed a firearm while committing the offenses and that he displayed, brandished, indicated possession, or used it to facilitate the offenses. R.C. 2941.145(A). As discussed above, both the testimony at trial and the video surveillance evidence demonstrated Mr. Ross possessed and used a firearm in the commission of the offenses of purposeful murder, felony murder, attempted murder, and felonious assault. Thus, there was sufficient evidence to support the three-year firearm specifications.

{¶ 36} To prove the five-year firearm specification, the state had to prove Mr. Ross committed a specific category of offenses and that the offenses "w[ere] committed by discharging a firearm from a motor vehicle other than a manufactured home." R.C. 2941.146(A). The five-year specification can only attach to felonies "that include[], as an essential element, purposely or knowingly causing or attempting to cause the death of or physical harm to another." *Id.* The offenses of purposeful murder, felony murder, attempted murder, and felonious assault each satisfy this criteria. *See* R.C. 2903.02(A); R.C. 2903.02(B); R.C. 2903.11(A)(1) and (2). Additionally, the surveillance video footage shows Mr. Ross standing in a vehicle that is not a manufactured home while firing his weapon at the victims' SUV. Mr. Ross also testified that he fired his weapon at the victims' SUV from inside the vehicle. Therefore, the state presented sufficient evidence to support the five-year firearm specifications.

{¶ 37} In summation, after an independent review of the evidence, we find sufficient evidence to support Mr. Ross's convictions of purposeful murder, felony murder, attempted murder, felonious assault, improperly handling a firearm in a motor vehicle, and the accompanying firearm specifications. Accordingly, the trial court did not err in overruling Mr. Ross's Crim.R. 29 motion for acquittal. We overrule Mr. Ross's first assignment of error.

## IV.  Second Assignment of Error—Manifest Weight of the Evidence

{¶ 38} In his second assignment of error, Mr. Ross argues his convictions were against the manifest weight of the evidence.

{¶ 39} A challenge to the manifest weight of the evidence attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *See, e.g., State v. Richey*, 2018-Ohio-3498, ¶ 50 (10th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 11-13, and *Thompkins*, 78 Ohio St.3d at 386-87. "Although evidence may be sufficient to sustain a guilty verdict, the issue of manifest weight requires a different type of analysis." *State v. Walker*, 2003-Ohio-986, ¶ 43 (10th Dist.). "[W]eight of the evidence" concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. *State v. Short*, 2024-Ohio-92, ¶ 10 (10th Dist.), citing *State v. Petty*, 2017-Ohio-1062, ¶ 60 (10th Dist.), quoting *State v. Boone*, 2015-Ohio-2648, ¶ 49 (10th Dist.), citing *Thompkins* at 387.

{¶ 40} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, this court sits as a "thirteenth juror" and may disagree "with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). *See also State v. Martin*, 2022-Ohio-4175, ¶ 26. In making this determination, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *See, e.g., Sparre v. Ohio Dept. of Transp.*, 2013-Ohio-4153, ¶ 10 (10th Dist.); *Eastley* at ¶ 20; *Thompkins* at 387; *Martin* at ¶ 26.

{¶ 41} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding credibility of witnesses and the weight of testimony are primarily for the trier of fact. *See, e.g., State v. DeHass*, 10 Ohio St.2d 230 (1997), paragraph one of the syllabus; *Morris v. Ohio Dept. of Rehab. & Corr.*, 2021-Ohio-3803, ¶ 64 (10th Dist.), citing *Watson v. Ohio Dept. of Rehab. & Corr.*, 2012-Ohio-1017, ¶ 31 (10th Dist.), citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc.* at 80.

{¶ 42} To reverse a jury verdict as being against the manifest weight of the evidence, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required pursuant to Article IV, Section 3(B)(3) of the Ohio Constitution. *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 2-4, citing *Thompkins* at paragraph four of the syllabus. *See also Short* at ¶ 13.

{¶ 43} Through this assignment of error, Mr. Ross asserts only that because the state presented insufficient evidence, his convictions must therefore be against the manifest weight of the evidence. He does not articulate any specific conflicts in the evidence that could result in his convictions being against the manifest weight of the evidence. *See State v. Tate*, 2014-Ohio-3667, ¶ 20 ("a prerequisite for any reversal on manifest-weight grounds is conflicting evidence"). The state argues Mr. Ross's failure to separately argue self-defense under his manifest-weight-of-the-evidence assignment of error waives that argument for purposes of appeal. *See State v. Lathon*, 2024-Ohio-5886, ¶ 149 (10th Dist.) ("[t]he party asserting error must carry the burden of affirmatively demonstrating that error on appeal," and this court need not "construct the legal arguments in support of an appellant's assignments of error"). Nonetheless, because Mr. Ross repeatedly referenced his claim of self-defense under his sufficiency-of-the-evidence argument in the first assignment of error, and because self-defense is properly reviewed under the manifest weight of the evidence, we will consider his arguments related to self-defense as a challenge to the manifest weight of the evidence. *See, e.g., State v. Goodwin*, 2014-Ohio-5669, ¶ 14 (10th Dist.) ("because the self-defense argument raised by appellant would be a proper argument in a manifest weight review, we will address appellant's argument in that context"

despite appellant's failure to separately argue self-defense under the manifest weight of the evidence); *Ferrell*, 2020-Ohio-6879, at ¶ 54.

{¶ 44} Mr. Ross argues his convictions are against the manifest weight of the evidence because the jury clearly lost its way in not believing his claim of self-defense. To defeat Mr. Ross's claim of self-defense, the state was required to prove, beyond a reasonable doubt, any of the following: (1) Mr. Ross was at fault in creating the situation giving rise to the affray; or (2) Mr. Ross did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape; or (3) Mr. Ross violated a duty to retreat or avoid the danger. *State v. Khalif*, 2024-Ohio-2239, ¶ 59 (10th Dist.), citing *State v. Messenger*, 2021-Ohio-2044, ¶ 36 (10th Dist.), *affirmed by Messenger*, 2022-Ohio-4562, citing *State v. Carney*, 2020-Ohio-2691, ¶ 31 (10th Dist.), and *State v. Daley*, 2020-Ohio-4390, ¶ 39 (10th Dist.). There is no duty to retreat where the defendant was in a place he had a lawful right to be. *State v. Cameron*, 2024-Ohio-2427, ¶ 31 (10th Dist.), quoting *State v. Palmer*, 2024-Ohio-539, ¶ 34, quoting R.C. 2901.09(B).

{¶ 45} Mr. Ross asserts his testimony demonstrated he acted in self-defense and the state did not convincingly prove otherwise. However, the trier of fact believing the state's version of events over the defendant's version of events does not render a conviction against the manifest weight of the evidence. *Khalif* at ¶ 60, citing *Messenger*, 2021-Ohio-2044, at ¶ 49 (10th Dist.), citing *State v. Lindsey*, 2015-Ohio-2169, ¶ 43 (10th Dist.) (rejecting defendant's argument that his conviction was against the manifest weight of the evidence because the jury did not believe his claim of self-defense). A trier of fact is free to believe "all, part, or none of a witness's testimony." *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.).

{¶ 46} In order to disprove a defendant's claim of self-defense, the state is required to disprove only one of the elements of self-defense beyond a reasonable doubt. Under the first element of a self-defense claim, the state can defeat a claim of self-defense by showing the defendant was at fault for the situation giving rise to the affray. As this court has explained, this element goes beyond the accused not being the immediate aggressor. (Further citations omitted.) *State v. Cumberlander*, 2024-Ohio-2431, ¶ 44 (10th Dist.). "A person may not provoke an assault or voluntarily enter an encounter and then claim a right

of self-defense." (Internal quotations and citations omitted.) *Id.* " '[A] multitude of courts have found that a defendant is at fault in creating the situation giving rise to the affray * * * when he chooses to confront the victim, chooses to knowingly go to a place where the victim will be[,] or refuses to move in a direction away from the victim, even when the defendant's action was otherwise completely lawful.' " *Id.*, quoting *State v. Ellis*, 2012-Ohio-3586, ¶ 15 (10th Dist.).

{¶ 47} Here, although Mr. Ross describes the whole scene as chaotic and unfolding very quickly, there was ample evidence that Mr. Ross voluntarily entered the encounter and chose to insert himself in the situation. The surveillance video showed that Mr. Ross was inside Sheetz when the shooting began, and was not near the vestibule where some of his group gathered and brandished their weapons. Indeed, many other Sheetz patrons who were inside the building at the time the shooting erupted fled further into the store away from the entrance and parking lot. Mr. Ross could have done the same or simply remained where he was inside the store. Instead, he took another drink of his beverage, walked to the front door, brandished his firearm, then went outside to join the encounter. "A person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense." *Patterson*, 2025-Ohio-280, at ¶ 41. The video evidence showed Mr. Ross make the deliberate, voluntary choice to insert himself into the gunfight when he could have remained safely inside. In light of this evidence, and the record in its entirety, we do not find the jury clearly lost its way in concluding the state disproved the first element of self-defense beyond a reasonable doubt. And because the state need only disprove one of the elements of self-defense, the jury did not clearly lose its way in rejecting Mr. Ross's argument that he acted in self-defense when he fired his weapon at the victim's vehicle.

{¶ 48} To the extent Mr. Ross argues on appeal that he entered the affray in order to protect his friends and relatives, he puts forth an argument that he acted in defense of another. *See Cumberlander* at ¶ 41, fn. 9, citing *State v. Moss*, 2006-Ohio-1647, ¶ 14 (10th Dist.) ("Defense of another requires proof of the same elements as self-defense."). Under the affirmative defense of defense of another, " 'one who intervenes to help [another person] stands in the shoes of the person whom he is aiding, and if the person aided is the one at fault, then the intervenor is not justified in his use of force.' " *Moss* at ¶ 13, quoting *State v. Wenger*, 58 Ohio St.2d 336, 340 (1979). We note, however, that although Mr. Ross

initially filed notice to seek a defense of others instruction, he abandoned his defense of others argument during trial and decided not to pursue such an instruction. (Tr. at 389-94.) As a result, the trial court instructed the jury only on self-defense, not on defense of another. (Jury Instructions at 14; Tr. at 478-81.) Because the jury was not instructed on defense of another, we cannot conclude the verdict was against the manifest weight of the evidence on that basis. Additionally, Mr. Ross does not assign any error as to trial counsel's failure to seek the defense of others instruction or to object to the self-defense instruction as given, so we do not consider the issue under that alternative framework.

{¶ 49} We conclude, therefore, that the manifest weight of the evidence supports Mr. Ross's convictions of murder, attempted murder, felonious assault, and improperly handling a firearm in a motor vehicle. Accordingly, we overrule Mr. Ross's second and final assignment of error.

## V. Disposition

{¶ 50} Based on the foregoing reasons, sufficient evidence and the manifest weight of the evidence support Mr. Ross's convictions of murder, attempted murder, felonious assault, and improperly handling a firearm in a motor vehicle. Having overruled Mr. Ross's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT and DINGUS, JJ., concur.